DAVIDOFF HUTCHER & CITRON LLP                    *Hearing Date: July 12, 2021 @ 10:00 a.m.*
*Attorneys for* James Carnicelli, Jr. derivatively on behalf of
The Gateway Development Group, Inc.
605 Third Avenue
New York, NY 10158
(212) 557-7200
Robert L. Rattet, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

In re:                                                                   :   Chapter 7
                                                                         :
THE GATEWAY DEVELOPMENT GROUP, INC.,     :   Case No.: 21-22304 (RDD)
                                                                         :
                Debtor.                               :
                                                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF HEARING ON MOTION OF JAMES CARNICELLI, JR.
DERIVATIVELY ON BEHALF OF THE GATEWAY DEVELOPMENT
GROUP, INC. FOR (I) DISMISSAL OF THE CHAPTER 7 CASE, OR (II)
IN THE ALTERNATIVE, TO BE PERMITTED TO CONTINUE AND
COMMENCE ACTIONS ON BEHALF OF THE CHAPTER 7 ESTATE
AGAINST JOHN FARERI AND FARERI-RELATED PARTIES**

      **PLEASE TAKE NOTICE**, that upon the annexed motion (the "Motion") of the Debtor,

the undersigned will move before the Honorable Robert D. Drain, Bankruptcy Judge, at the

United States Bankruptcy Court, White Plains Division, 300 Quarropas Street, White Plains,

New York 10601 on July 12, 2021 at 10:00 a.m. (the "Hearing"), or as soon thereafter as counsel

may be heard, to consider the Motion and the Debtor's request therein for entry of an order:

      1.      Dismissing the Chapter 7 Case or in the alternative abstaining from same
              pursuant to 11 U.S.C. §§707(a) and 305;

      2.      granting leave to Mr. James Carnicelli Jr. to prosecute claims and/or
              actions, derivatively on behalf of Development, against Gateway
              Kensington LLC and entities related to John J. Fareri ("Fareri") and other

Fareri-related parties and lifting the automatic stay, to the extent it applies, in connection therewith; and

3.     Such other and further relief as is just under the circumstances.

**PLEASE TAKE FURTHER NOTICE,** that the Hearing will be held via telephonic conference only. Parties who wish to appear must register with Court Solutions at www.court-solutions.com in advance of the hearing.

**PLEASE TAKE FURTHER NOTICE**, that objections, if any, to any of the relief requested in the Motion shall be made in writing, filed with the Court on the Court's Electronic Case Filing System at www.ecf.nysb.uscourts.gov (Login and password required) with a copy delivered directly to Hon. Robert D. Drain and served upon the undersigned no later than July 5, 2021 at 4:00 p.m.

Dated:  New York, New York
        June 8, 2021

                                        DAVIDOFF HUTCHER & CITRON LLP
                                        *Attorneys for* James Carnicelli, Jr.
                                        derivatively on behalf of
                                        The Gateway Development Group, Inc
                                        120 Bloomingdale Road, Suite 100
                                        White Plains, New York 10605
                                        (914) 381-7400


                                        By:  */s/ Robert L. Rattet*
                                             Robert L. Rattet

DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for* James Carnicelli, Jr. derivatively on behalf of
The Gateway Development Group, Inc.
605 Third Avenue
New York, NY 10158
(212) 557-7200
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

*Hearing Date: _____ @ 10:00 a.m.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

In re:                                       :   Chapter 7
                                             :

THE GATEWAY DEVELOPMENT GROUP, INC.,  :   Case No.: 21-22304 (RDD)
                                           :

                    Debtor.                :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF JAMES CARNICELLI, JR. DERIVATIVELY ON BEHALF OF
THE GATEWAY DEVELOPMENT GROUP, INC. FOR (I) DISMISSAL OF THE
CHAPTER 7 CASE, OR (II) IN THE ALTERNATIVE, TO BE PERMITTED TO
CONTINUE AND COMMENCE ACTIONS ON BEHALF OF THE CHAPTER 7
ESTATE AGAINST JOHN FARERI AND FARERI-RELATED PARTIES**

       James Carnicelli, Jr. ("Mr. Carnicelli" or the "Movant") in his capacity acting derivatively

on behalf of The Gateway Development Group, Inc. ("Development"), by his counsel Davidoff

Hutcher & Citron LLP, as and for his motion (the "Motion") seeking entry of an order, (i)

pursuant to 11 U.S.C. §§ 707(a) and 305(a), dismissing the above-captioned Chapter 7 case (the

"Chapter 7 Case") of Development; and (ii) granting leave to Mr. James Carnicelli Jr. to prosecute

claims and/or actions, derivatively on behalf of Development, in the Gateway Kensington, LLC

Chapter 11 case, Case No. 21-22247 (the "Kensington Case") against entities related to John J.

Fareri ("Fareri") and other Fareri-related parties, to protect Movant's interests in the Kensington

Case, and lifting the automatic stay, to the extent it applies, in connection therewith respectfully

1

represents as follows:

## A.    INTRODUCTION

1.    The Chapter 7 Case, *In re: The Gateway Development Group, Inc.* was filed purely as a litigation tactic by John J. Fareri ("Fareri"), the Chairman of Development, and not for any proper use of the provisions of Title 11. The Chapter 7 Case was commenced at Fareri's direction for the sole purpose of hamstringing and suppressing Movant from taking any steps to protect Development's rights as the largest, and for practical purposes, the *only* unsecured creditor in a companion and extremely substantial Chapter 11 proceeding *In re Gateway Kensington LLC* ("Kensington"), filed in the U.S. Bankruptcy Court, Southern District of New York, Case No. 21-22274 (the "Kensington Case").[1]  Development is the primary beneficiary of an Award of Arbitrators against Kensington dated April 23, 2021 (the "Award") in the amount of $14,333,446.38, plus interest and other relief. This Award was the immediate precipitating cause of Kensington's filing.

2.    Such disenfranchising conduct, as will be discussed in further detail herein, has all the indicia of a bad faith filing and does not belong in the bankruptcy courts.

3.    Development has de minimis creditors other than Mr. Carnicelli, insiders and professionals.

4.    Development's voluntary petition (the "Petition") by its own terms indicates that Development is solvent. The Petition estimates Development's assets at between $10 and $50

---

[1] Under a Shareholders' Agreement dated January 1, 2014 (the "Shareholders' Agreement") Fareri is the Chairman of the Board of Directors, Mr. Carnicelli. is the President and Julie Fareri is the Secretary. Fareri is the 51% shareholder and Mr. Carnicelli is the 49% shareholder. Additionally, Fareri owns 99% of Kensington and his wife owns 1% of Kensington.

million, and its liabilities at between $1 and $10 million. 21-22304-RDD, ECF Docket No. 1.

5.    Movant has further reason to believe that Development is solvent because, among other things, Development's internal accounting records demonstrate that its assets exceed its liabilities by a ratio of **in excess of 35 to 1**. See balance sheet as of December 31, 2020 annexed hereto as Exhibit "1." Specifically, the balance sheet shows that Development was solvent to the tune of over $1.5 million dollars as of December 31, 2020.  Id.

6.    Development has had no operations since that time, as those operations were terminated on October 18, 2019.  By email dated October 18, 2019 to Mr. Carnicelli, a copy of which is annexed hereto as Exhibit "2", Julie Fareri wrote, in relevant part:

> Given the overall circumstances, acting as the majority shareholder and sole director of Gateway [Fareri] has decided to suspend operations of the company. This means that at this point you should not come to the office at 2 Dearfield and John has decided to award the Goshen project to WESCORP, please refrain from going to that site also. As of the end of work day today, October 18, 2019, you will no longer have access to your Gateway email or work computer.

7.    Thus, Fareri's termination of the business operations of Development deprived it of valuable corporate opportunities, such as the Goshen project mentioned above, as well as others, including, but not limited to, an over one billion dollar construction project for a Westchester biotech campus called The North 60.[2]  These are significant breaches of fiduciary duties by Fareri.

8.    Fareri purported to terminate Mr. Carnicelli, and effectively ended Development's operations. Mr. Carnicelli contends this purported termination was ineffective.

9.    The only significant thing that has transpired since December 31, 2020 is that

---

[2] *See*, The North 60, www.thenorth60.com (last visited June 4, 2021) ("[T]he North 60 is an innovative bioscience, technology and lifestyle campus that expands and enhances Westchester County's thriving biotech/healthcare sector. The $1.2 billion project will generate thousands of new high-paying careers in bioscience, healthcare and research.").

Development was awarded in excess of $14,300,000 in an arbitration against Kensington, which is owned 100% by Fareri and his wife. Accordingly, if Development was solvent prior to the Award, the Award only makes it even more solvent.

10.     Fareri is also a 51% shareholder of Development, and so controls both entities.

11.     Although Fareri is the 51% owner of Development, he refused to bring the arbitration against Kensington. As such, Mr. Carnicelli was forced to derivatively bring the proceeding, and finance it himself, which resulted in an arbitration award in excess of $14.3 million in favor of Development and Mr. Carnicelli. The Award was divided $14,228,806 to Development and $104,640.38 to Mr. Carnicelli. Additional details concerning the Award and especially related litigation against Fareri and other Fareri-related parties are set forth below and in the Declaration of Joseph M. Pastore, annexed hereto as Exhibit "3" (the "Pastore Declaration").

12.     In addition to hamstringing the collection of the Award, it is abundantly clear this action was filed as a ploy to avoid the significant obligations of litigation. The petition was filed in an obvious attempt to disenfranchise Movant, putting the Movant at significant risk of voicing his objections only in the manner contemplated by the Bankruptcy Code. The right to "notice and a hearing" as provided by 11 U.S.C. §102(a)(1)(A) would indeed be quite empty if a party receiving notice were muzzled by the automatic stay created by Development's Chapter 7 filing.

13.     With the filing of the Chapter 7 Case, Mr. Carnicelli's ability to vote in the Kensington Case on behalf of Development and to participate in gathering its assets to maximize recoveries has been curtailed.

14.     The Pastore Declaration sets forth additional facts and circumstances relating to the timing of the Chapter 7 Case and remedies that Movant is seeking in an action currently pending

in Connecticut state court (the "Connecticut Action").[3] The Declaration is attached to further demonstrate that the filing was made in bad faith, was orchestrated to avoid the risk of litigation to Fareri personally, and was made to avoid discovery obligations immediately coming due in the Connecticut Action, that would further reveal Fareri's treachery and deceit, and that would disclose obligations immediately due and owing to Movant and Development.

15.     Again, by filing this Chapter 7 Case, Fareri seeks to deprive Mr. Carnicelli of the ability to recover on his claims and the derivative claims in the Connecticut Action, in which Fareri faces millions of dollars in potential personal liability to Development and Mr. Carnicelli.

16.     Further, by filing the Chapter 7 Case, Development places any actions that Movant takes in the Kensington Case as potentially violative of the automatic stay, 11 U.S.C. §362. Mr. Carnicelli, as the 49% shareholder of Development, and its President (as set forth in the Shareholders' Agreement) received no notice of any Director or Shareholder meeting before the petition was filed. Instead, Fareri signed Development's petition, implicitly claiming that there was corporate authority. This implicit claim is false. Furthermore, Fareri certified under the penalties of perjury that the filing was in the best interests of, among others, the shareholders of Development, even though he never sought any input from Carnicelli prior to filing, and clearly has no intention of seeking to enforce Development's Award against his solely owned company Kensington, which award is by far Development's single most valuable asset. This not only constitutes a significant breach of fiduciary duty on the part of Fareri to Mr. Carnicelli but also comprises an orchestrated scheme to strip Movant of very substantial rights.

---

[3] The Connecticut Action is captioned as follows:  FST-CV20-6048778-S: *James Carnicelli Jr v. John J. Fareri, Julie Fareri, Christopher Sheskier, and The Gateway Development Group, Inc. and James Carnicelli Jr, Derivative Plaintiff vs John J. Fareri, Julie Fareri, and Christopher Sheskier, Derivative Defendants and The Gateway Development Group, Inc., Nominal Defendant.*

17.     Significantly, the Petition lacks a Statement Regarding Authority To Sign And File Petition, which the Kensington petition contains.

18.     Instead, Fareri, violated his fiduciary duties to Development and Mr. Carnicelli, by filing the Petition.  And by signing both Development and Kensington's petitions, he has made it clear that his irreconcilable conflict of interest has and will cause serious damage to all the stakeholders of Development if the Chapter 7 Case is allowed to continue.

19.     In fact, it is beyond peradventure that Fareri will likely seek collusive settlements that deprive Movant of his rights, by virtue of continued chicanery and deceit as described in more detail below.

**B.      BACKGROUND**

The Arbitration Proceeding and the Award

20.     The details of the arbitration proceeding are set forth in the Award. A copy of the Award is annexed hereto as Exhibit "4". A detailed discussion of the arbitration proceedings can be found in the Award.

21.     As set forth in the Award, Development and Kensington entered into a "Construction Management Agreement By and Between Gateway Kensington LLC and The Gateway Development Group, Inc." dated "as of May 5, 2014" (the "Contract").

22.     The purpose of the Contract was the development of a condominium development at 15 Kensington Road, Bronxville, New York 10708 (the "Project"). Kensington's schedules allege that Kensington owns seven units, Condominium Units 104, 208, 211, 311, 312, PH-3, and PH-5 located 15 Kensington Road, Bronxville, New York 10708. Significantly, however, a title report obtained by Mr. Carnicelli shows eight units, including Unit 110 which is not listed in

Kensington's schedules. A copy of this report is annexed hereto as Exhibit "5". Upon information and belief, Units 408 and 410 on the report are the penthouses (PH) listed in the schedules. The disposition of proceeds from Unit 110 are not accounted for.

23. When Mr. Carnicelli believed that Development was substantially underpaid by Kensington, Mr. Carnicelli first demanded that Development commence an arbitration. When that demand was refused Mr. Carnicelli commenced an arbitration derivatively on behalf of Development against Kensington (the "Kensington Arbitration") seeking payment on the claim against Kensington

24. The Kensington Arbitration was brought derivatively by Mr. Carnicelli as minority shareholder of Development (49%) on behalf of Development to enforce Development's rights under the Contract. Mr. Carnicelli was the President of Development and ran its day-to-day operations. Fareri is the majority shareholder (51%) of Development. Development was a construction management firm whose work mainly consisted of construction projects performed for its majority owner Fareri. Fareri abruptly purported to terminate Mr. Carnicelli in October 2019, shortly prior to the commencement of the Kensington Arbitration. Fareri's action blatantly breached the Shareholders' Agreement, which provides that Mr. Carnicelli cannot be removed from his position, "with or without cause, for any reason whatsoever."

25. Kensington retained Development as its construction manager for the Project. The Project had a Brownfield tax credit component to it whereby Fareri, personally, could obtain income tax credits for remediating and developing the site. The amount of the tax credit was primarily based on the cost of the cleanup and the cost of the construction of the buildings and appurtenant structures on the site. The tax credit was available for site preparation work (contamination remediation) and for tangible property work (above ground construction). As a

result, Kensington claimed Brownfield tax credits of over $14 million in connection with the Project to benefit Fareri personally.

26.     An Award of $14,333,446.38 was granted unanimously by a panel of three arbitrators.  In short, the arbitrators awarded to Development the sum of $12,717,357.00, plus interest from December 31, 2019 to April 26, 2021 totaling $1,511,449.00. Arbitration compensation and AAA fees in the amount of $104,640.38 were awarded directly to Mr. Carnicelli for a total Award of $14,333,446.38.

<u>The Connecticut Action</u>

27.     On October 9, 2020 Mr. Carnicelli commenced an action both directly and derivatively against Fareri, Julie Fareri, Christopher Sheskier, and Development on a derivative basis in an action captioned *James Carnicelli, Jr. v. John J. Fareri, Et Al* (FST-CV20-6048778-S) (the "Connecticut Action") which is currently pending on the Complex Litigation Docket of the Stamford Superior Court. Ex. 3 ¶ 3.

28.     In the Connecticut Action, Mr. Carnicelli and Development seek damages associated with Fareri's fraud, breach of fiduciary duty and wrongful actions that caused entities he controls not to pay Development its fair fees and rates in connection with multiple construction projects.

29.     The Connecticut Action also seeks the lawful dissolution of Development, which is a Connecticut corporation. As a result, the Kensington Arbitration is relevant to the Connecticut Action to the extent that the Connecticut court is empowered to divide the assets of Development.

30.     In the Connecticut Action, Fareri has attempted to dismiss the case. That motion was denied by Judge Sheila A. Ozalis. Fareri also moved to compel arbitration. That motion was also denied by Judge Ozalis. Fareri has also filed a Request to Revise. That motion was

substantially defeated. Ex. 3 ¶ 5.

31.     The projects at issue in the Connecticut Action include multiple projects other than the Project, which was resolved in the Kensington Arbitration. Ex. 3 ¶ 4 n.1.

32.     Upon the granting of the Award in the Kensington Arbitration, Mr. Carnicelli filed an Application for Temporary Injunction and Preliminary Injunction in the Connecticut Action, seeking to make sure that any payments by Kensington to Development were restrained at Development pending dissolution of Development.

33.     A preliminary injunction hearing was set for May 26, 2021 in front of Judge Ozalis.

34.     On May 25, 2021, Fareri filed this Chapter 7 Case in an attempt to avoid the preliminary injunction hearing set for May 26, 2021 and to prevent Development's collection of the Award from Kensington. Bluntly speaking, Fareri sought to substitute a related party for Movant as plaintiff in order to engineer a collusive settlement, with respect to which Movant would be disenfranchised from objecting.

35.     During the limited course of the Connecticut Action, Judge Ozalis ordered the production of corporate documents which Fareri had refused to produce for over a year, despite Mr. Carnicelli having the right to inspect such documents under the Shareholders' Agreement as a 49% shareholder of Development. Ex. 3 ¶ 9.

36.     Additional discovery in the Connecticut Action was due on June 4, 2021. This date, however, has been stayed owing to the filing of the Chapter 7 Case. Ex. 3 ¶ 10.

37.     Thus, it is Mr. Carnicelli's position that this Chapter 7 Case was filed in part to avoid obligations in the Connecticut Action, such as discovery and the preliminary injunction hearing, and is overall a bad faith filing with Development's assets far exceeding its liabilities.

<u>This Filing of the Chapter 11 and Chapter 7 Cases</u>

38.     The Award was entered April 23, 2021. On May 4, 2021 Mr. Carnicelli, derivatively on behalf of Development, commenced a special proceeding to confirm the Award in Supreme Court, Westchester County, entitled *James Carnicelli Jr. derivatively on behalf of, The Gateway Development Group, Inc. v. Gateway Kensington, LLC*, Index Number 56060/2021.

39.     On May 14, 2021 – the return date of the petition to confirm the Award -- Kensington filed for relief under Chapter 11, Case No. 21-22274.

40.     On May 25, 2021 – the day before the hearing on Mr. Carnicelli's Application for a Preliminary Injunction in the Connecticut Action -- Development filed for relief under Chapter 7.

41.     The special proceeding to confirm the Award was stayed by the filing of the Kensington Case on May 14, 2021. In addition, Fareri asserted that the Connecticut Action was stayed in its entirety by Development's Chapter 7 Case.

42.     The court, however, after expressing skepticism about the filing, including with respect to its timing, ordered briefing as to whether all claims in the action were stayed pursuant to 11 U.S.C. § 362.

## C.     ARGUMENT

## I.     THE COURT SHOULD ABSTAIN FROM THIS CHAPTER 7 CASE OR DISMISS THE CASE AS A BAD FAITH FILING, WITH PREJUDICE AGAINST RE-FILING

43.     This Court has the power to dismiss this action for cause. 11 U.S.C. §707(a), relating to the dismissal of Chapter 7 cases provides:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

44.     The definition of "cause" is illustrative and not exclusive. *See, e.g. In re Chovev*, 559 B.R. 339, 343 (Bankr. E.D.N.Y. 2016) ("Under § 707(a), a chapter 7 case may be dismissed for "cause." Although the Bankruptcy Code does not define the term "cause," § 707(a) lists three nonexclusive illustrations of cause….") Footnote "10" in <u>Chovev, Id</u>. states: "The introductory word "including" means that the three enumerated types of cause are nonexclusive. See § 102(3) (" 'includes' and 'including' are not limiting". <u>In</u> re <u>Chovev, 559 B.R. 339, 343 (Bankr. E.D.N.Y. 2016))</u>

45.     *In re Smith*, 507 F.3d 64, 72 (2d Cir. 2007) where the Court stated:

> Motions to dismiss a bankruptcy petition are governed by section 707 of the Bankruptcy Code, which provides:
> The [bankruptcy] court may dismiss a case ... only after notice and a hearing and only for cause, including—
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
> (2) nonpayment of any fees and charges required under chapter 123 of title 28; and
> (3) failure of the debtor in a voluntary case to file, within fifteen

days ... the information required by paragraph (1) of section 521, but only on a motion by the United States trustee.

11 U.S.C. § 707(a). Although this provision does not specifically provide for a debtor's motion to dismiss a voluntarily-filed petition, courts have routinely held that section 707(a) applies to such cases. *See, e.g., Turpen v. Eide (In re Turpen),* 244 B.R. 431, 434 (8th Cir. BAP 2000); *In re Schwartz,* 58 B.R. 923, 925 (Bankr.S.D.N.Y.1986); *In re Klein,* 39 B.R. 530, 532 (Bankr.E.D.N.Y.1984). Under section 707(a), "the debtor has no absolute right to dismissal of a Chapter 7 case." *Turpen,* 244 B.R. at 434; *see also In re Klein,* 39 B.R. at 532. Rather, a debtor seeking dismissal must show "cause." 11 U.S.C. § 707(a); *see Dinova v. Harris (In re Dinova),* 212 B.R. 437, 442 (2d Cir. BAP 1997). However, the Bankruptcy Code does not define "cause," and the three examples given in section 707(a) are illustrative, not exclusive. *See Neary v. Padilla (In re Padilla),* 222 F.3d 1184, 1191 (9th Cir.2000); *Dionne v. Simmons (In re Simmons),* 200 F.3d 738, 743 (11th Cir.2000).

<u>In re Smith</u>, 507 F.3d 64, 72 (2d Cir. 2007)

46.     In determining whether cause exists, courts have utilized 11 U.S.C. §305(a)(1), relating to abstention, for guidance. 11 U.S.C. §305(a)(1) provides:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if--
(1) the interests of creditors and the debtor would be better served by such dismissal or suspension;

47.     11 U.S.C. §105(a) provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

48.      "A bankruptcy court as a court of equity has the inherent power to dismiss a case when its jurisdiction has been improperly invoked." *In re Conf. of Afr. Union First Colored*

*Methodist Protestant Church*, 184 B.R. 207, 222 (Bankr. D. Del. 1995). *The African Union First Colored, Id.* Court stated further:

> In *Matter of Century City, Inc.,* 8 B.R. 25, 29 (D.N.J. 1980), the court cited the ample authority for this proposition:
>
> **[U]nder its inherent power the Court may act *sua sponte* to dismiss, independently of the grounds specified in either § 305[a] or § 1112[b] of the Code.** (internal citations omitted) The power of the Court to dismiss a case when its jurisdiction has been improperly invoked is inherent in the bankruptcy court as a court of equity, guided by equitable doctrines and principles;
>  (citations omitted.)
>
> *****************
>
> For purposes of exercising the power authorized by Code § 105(a), it makes no difference whether it is a Chapter 11 case or a Chapter 7 case.

The *African Union First Colored, Id.* Court set forth the factors underlying such a conclusion:

> I have described above in some detail why I find this case achieves no bankruptcy law objective and has only served to delay and frustrate legitimate state court proceedings. In summary, I find the following factors support the conclusion that this Chapter 7 filing was an abuse of the bankruptcy process:
>
> ********************
>
> (3) This Chapter 7 filing is the latest tactical maneuver by Debtor in a four-year struggle with its principal adversary involving purely state law issues properly considered in state court proceedings.
> (4) Debtor's counsel has made it clear that the petition filing is intended to render moot, or dispose of by *res judicata,* state law issues which have been properly and extensively considered by state courts over a number of years.
> (5) Debtor has expressed two reasons for filing this Chapter 7 case which are not consonant with bankruptcy law policy, namely,
> (a) to try to convince a state court as to a factual contention being made by Debtor in that court, and
> (b) to establish a proposition regarding security interests in Debtor's property which cannot be established by a Chapter 7 filing.
>
> **I find that this Chapter 7 case serves no cognizable bankruptcy law purpose, but, rather, is an obvious attempt to circumvent**

> **and frustrate the disposition of state law remedies in state law tribunals and, accordingly, I dismiss the case.** (emphasis supplied)
>
> *In re Conf. of Afr. Union First Colored Methodist Protestant Church*, 184 B.R. 207, 222–24 (Bankr. D. Del. 1995)

49. Thus, a Chapter 7 case, as well as a Chapter 11 case, can be dismissed as being filed in bad faith and not for a legitimate bankruptcy purpose, utilizing 11 U.S.C. §§305(a) and 105(a).

50. It is well-settled that "cause" for dismissal purposes includes a filing made in bad faith. *In re C-TC 9th Avenue Partnership v. Norton Movant (In re C-TC 9th Ave P'ship)*, 113 F.3d 1304, 1310 (2d Cir. 1997); *see also Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227-28 (2d Cir. 1991); *In re SGL Carbon Corp.*, 200 F.3d 154, 160-61 (3d Cir. 1999) (compiling cases); *In re Schur Management*, 323 B.R. 123, 126 (Bankr. S.D.N.Y. 2005).

51. The Second Circuit Court of Appeals in <u>C-TC,</u> <u>Id.</u> has found the following eight factors to be indicative of a bad faith filing giving rise to "cause" for dismissal:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees
>
> *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997)

In *C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1309 (2d Cir. 1997) the Circuit Court stated that "the

bankruptcy court found that the 'primary characteristic of the Debtor's Chapter 11 case is its

longstanding dispute with Norton' and, thus, that the primary function of the petition was to serve

as a litigation tactic." *See In re C-TC 9th Ave. Partnership*, 113 F.3d at 1311; see also, *In re Phoenix

Piccadilly, Ltd.*, 849 F.2d 1393, 1394-95 (11h Cir. 1988); *In re Kaplan Breslaw Ash, LLC*, 264

B.R. 309 (Bankr. S.D.N.Y. 2001); *234-6 West 22nd St. Corp.*, 214 B.R. 751, 760 (Bankr. S.D.N.Y.

1997).

52.     In *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311, the Second Circuit set forth a

number of factors to determine whether a debtor has acted in bad faith.  A comparison of those

factors to the facts of Development's case illustrates Development's bad faith in commencing this

case:

| C-TC 9th Ave. P'Ship Factor | Development's Case |
|---|---|
| (1) the debtor has only one asset; | (1) Development's only assets are the Award and its rights as Plaintiff to assert its claims against Kensington and Fareri-related parties; |
| (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; | (2) Development has de minimis unsecured creditors other than Mr. Carnicelli; including insiders and professionals working on this litigation |
| (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; | (3) Development's one asset is part of a two-party dispute involving Development's claims against Kensington and against Fareri-related parties; |
| (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; | (4) Development's "financial condition" is entirely related to the two-party dispute relating to Development's claims against Kensington and against Fareri-related parties. All disputes can be (and have been) resolved within the pending state court proceeding to |

| | confirm the Award and the Connecticut Action; |
|---|---|
| (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; | (5) Kensington filed its Chapter 11 proceeding on the return date of the special proceeding Mr. Carnicelli, derivatively on behalf of Development, commenced to confirm the Award. Development filed this Chapter 7 Case the day that the judge in the Connecticut Action intended to hold a hearing on Mr. Carnicelli's application for injunctive relief. |
| (6) the debtor has little or no cash flow; | (6) Development has <u>no</u> cash flow. Development's cash flow was terminated when Julie Fareri sent the email (Exhibit "2") purporting to terminate Mr. Carnicelli and assigning the Goshen project to Wescorp; |
| (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and | (7) this case is a Chapter 7 case so this factor is met; and Development's ability to meet current expenses was terminated when Julie Fareri sent the email (Exhibit "2") purporting to terminate Mr. Carnicelli and assigning the Goshen project to Wescorp; |
| (8) the debtor has no employees. | (8) Development takes the position, via the October 18, 2019 email (Exhibit "2") that it has no employees. This is contrary to the Shareholders' Agreement. However, the activity of any employees was purportedly terminated. Also, unlike the Chapter 11 proceedings discussed in C-TC, Id. a chapter 7 Debtor normally has few employees. |

53.     This Chapter 7 Case is illustrative of the use of the Chapter 7 Case as a litigation tactic. By virtue of the filing, Development is precluded from taking any steps to enforce its rights in the Kensington Case since 11 U.S.C. § 362(a)(3) precludes "any act to…exercise control over property of the estate."

54.     In the context of Chapter 11, "(a)s a general rule where, as here, the timing of the

filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." <u>In re HBA East, Inc.</u>, 87 B.R. 248, 259–60 …. Chapter 11 was never intended to be used as a fist in a two party bout. The Chapter is entitled reorganization and not litigation. <u>In re HBA East, Inc.</u>, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988). Chapter 7 is intended to be used in aid of an orderly liquidation, not as a tactic in two-party litigation.

55.     While Development does not own real estate every other C-TC bad faith factor is present.

56.     This case starkly illustrates the manipulative and deceptive use of a Chapter 7 filing. The proper purpose of a Chapter 7 filing is to achieve an orderly liquidation of assets. The purpose does not include the deliberate, orchestrated disenfranchisement of the rights of the sole major non-aligned creditor.

## II.     IN THE ALTERNATIVE, THE COURT MAY GRANT LEAVE, PURSUANT TO 11 U.S.C. §362 TO MR. CARNICELLI TO PROSECUTE ACTIONS ON BEHALF OF THE ESTATE OF DEVELOPMENT

57.     If the Court declines to dismiss the Chapter 7 Case, the Court may grant leave to Mr. Carnicelli to prosecute actions, derivatively on behalf of Development, against Kensington and other Fareri-related parties.

58.     The authority for the granting of this relief are the holdings of the Court in *In re Housecraft Industries USA, Inc. v. Murad*, 310 F.3d 64, 71 n.7 (2d Cir. 2002); accord *Canadian Pacific Forest Products Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.)*, 66 F.3d 1436, 1442 (6th Cir. 1995) and *Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir 1985).

59.     The Second Circuit routinely authorizes parties in interest to commence litigation

on behalf of the Estate where the Estate fiduciary is unwilling to do so. See, e.g. *Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir 1985).

> The standard in this circuit that a party in interest must meet to obtain derivative standing to sue on behalf of an estate contains a two part test:
> (1) the debtor must unjustifiably refuse to bring suit or the party in interest must have the consent of the debtor in possession or trustee, and
> (2) the court must find that suit by the party in interest is
>
> A. in the best interest of the bankruptcy estate, and
> B. necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *Housecraft Industries*, 310 F.3d at 71 (citing *Commodore* 262 F.3d at 100).

60. Mr. Carnicelli here has little confidence that the Trustee in a Chapter 7 Case engineered by the principal of Kensington will vigorously pursue remedies that primarily benefit the rival litigant in this two-party dispute. Indeed, the Trustee's aggressive substitution of Mr. Pastore as litigation counsel by Zeisler & Zeisler, P.C. is incredibly wasteful of resources, as Mr. Pastore and his firm have mastered the facts and circumstances involved in the Connecticut Action.

61. In *In re Kaplan Breslaw Ash, LLC*, Judge Gerber considered a similar set of circumstances and found the debtor's bad faith filing to constitute cause for stay relief. In so doing, the court noted:

> Here, under the totality of the circumstances, the Court finds this case to be indistinguishable in relevant respects from *234-6 West 22nd St.*, and applying criteria in that case and *C-TC TC 9th Ave. Partnership*, the Court concludes that this case should be dismissed for substantially the same reasons. Here the Debtor has only one asset, the Warehouse. It has no employees. It produces no income, and has no discernible cash flow. It has very few unsecured creditors (especially non-insiders), and none, so far as the Court can determine, that would be helped by a chapter 11 reorganization. (Indeed, the two largest unsecured claims-though recognizing the likelihood that they will overlap - are those of the Mortgage holder and Sterling, affiliates of each other who support relief from the stay.) The Warehouse is the subject of a foreclosure action as the

result of arrearages on the Mortgage holder's secured debts. The case is essentially a two- party dispute between the Mortgage holder and the Debtor, and the timing of the Debtor's entry into bankruptcy (initially in New Jersey) has caused the Court to find as a fact that the Debtor timed its bankruptcy filing so that it could avail itself of the automatic stay in order to stop the foreclosure action.

*In re Kaplan Breslaw Ash, LLC*, 264 B.R. at 335.

62.    Here, Development's bad faith in filing the Chapter 7 Case in itself constitutes cause to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(1). *See In re Kornhauser*, 184 B.R. 425, 428 (Bankr. S.D.N.Y. 1995); *Manhattan King David Restaurant, Inc. v. Levine*, 163 B.R. 36, 40 (S.D.N.Y. 1993). As more fully set forth above, it is clear that Development's Petition was filed in bad faith without a valid Title 11 purpose and, accordingly, cause exists to vacate the automatic stay as it pertains to Mr. Carnicelli to permit the continued pursuit of Development's derivative rights against Kensington and in the Connecticut Action, whether as a lifting of the automatic stay or under *STN. Id.*

### D. CONCLUSION

For all the reasons set forth herein, Movant respectfully requests that the Court enter an order (i) dismissing Development's Chapter 7 Case with prejudice against re-filing or, (ii) in the alternative, lifting, terminating or modifying the automatic stay to enable Movant to prosecute derivative claims against Kensington and other Fareri-related parties, and grant Movant such other and further relief as may be just and proper.

Dated: New York, New York
June 4, 2021

Respectfully submitted,

DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for James Carnicelli Jr., Individually and derivatively on behalf of The Gateway Development Group, Inc.*

By: */s/ Robert L. Rattet*
    Robert L. Rattet
    Jonathan S. Pasternak
605 Third Avenue
New York, New York 10158
(212) 557-7200

EXHIBIT "1"

# The Gateway Development Group, Inc
## Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1001 · Cash - Gateway #0750 | -2,139.04 |
| **Total Checking/Savings** | -2,139.04 |
| **Accounts Receivable** | |
| 1200 · Accounts Receivable | -270,624.67 |
| **Total Accounts Receivable** | -270,624.67 |
| **Other Current Assets** | |
| 1300 · Exch - JJF | 512,839.46 |
| 1310 · Exch - JEC | 1,494,136.19 |
| **Total Other Current Assets** | 2,006,975.65 |
| **Total Current Assets** | 1,734,211.94 |
| **Fixed Assets** | |
| 1910 · Office Equipment | 54,605.11 |
| 1950 · Accumulated Depreciation | -54,605.11 |
| **Total Fixed Assets** | 0.00 |
| **TOTAL ASSETS** | 1,734,211.94 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 49,063.26 |
| **Total Accounts Payable** | 49,063.26 |
| **Total Current Liabilities** | 49,063.26 |
| **Total Liabilities** | 49,063.26 |
| **Equity** | |
| Equity - JEC Cash Basis | 4,175.72 |
| Equity - JJF Cash Basis | 4,343.84 |
| 1110 · Retained Earnings | -168,998.69 |
| 1520 · Capital Stock | 1,000.00 |
| Net Income | 1,844,639.99 |
| **Total Equity** | 1,685,160.86 |
| **TOTAL LIABILITIES & EQUITY** | 1,734,224.12 |

EXHIBIT "2"



**From:** Julie Fareri <<u>JFareri@fareriassociates.com</u>>
**Date:** October 18, 2019 at 5:06:33 PM EDT
**To:** Jim Carnicelli <<u>JCarnicelli@gatewaydev.com</u>>
**Cc:** John Fareri <<u>John@fareriassociates.com</u>>, "John Tesei (<u>JPT@gtlslaw.com</u>)"
<<u>JPT@gtlslaw.com</u>>
**Subject: On behalf of John Fareri**

Jim,

I have spoken to John and he asked me to reach out to you.   Given the overall circumstances, acting as the majority shareholder and sole director of Gateway he has decided to suspend operations of the company.  This means that at this point you should not come to the office at 2 Dearfield and John has decided to award the Goshen project to WESCORP, please refrain from going to that site also.  As of the end of work day today, October 18, 2019, you will no longer have access to your Gateway email or work computer.

John does not believe it is appropriate or productive for you and he to engage in any further direct communications until there is a resolution of the current situation; and, in that regard, we are suggesting that you engage an attorney to represent you in negotiating a mutually acceptable settlement.  We have briefed John Tesei and ask that your attorney contact John Tesei as soon as possible.

It is beyond unfortunate that we  are  where we are today and I would hope you would agree that the sooner we can arrive at a settlement the better it will be for all.

Julie

Julie Fareri Zielinski, Esq.
Fareri Associates, LP
2 Dearfield Drive
Suite 3
Greenwich, CT 06831
203-422-6700 ext. 115
Cell: 203-223-2875

Confidentiality Note:  This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the

information herein by anyone other than the intended recipient, or any employee or agent responsible for delivering the message to the intended recipient, is prohibited.  If you have received this e-mail in error, please call the sender and destroy the original message and all copies.

EXHIBIT "3"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:

The Gateway Development Group, Inc.
                                  Chapter 7
                                  Case No. 21-22304 (RDD)

               Debtor.

-------------------------------------------------------------------X

## DECLARATION OF JOSEPH M. PASTORE III
## IN SUPPORT OF MOTION TO DISMISS

I, Joseph M. Pastore III, do hereby declare:

1.     I am an attorney licensed to practice law in the states of Connecticut and New York and in the Southern District of New York.

2.     This Chapter 7 Voluntary Application for Bankruptcy (the "Bankruptcy") was filed under the authority of John J. Fareri ("Fareri"), purportedly as the Chairman and CEO of Gateway Development Group, Inc. ("Development").

3.     My firm represents James Carnicelli, Jr. ("Mr. Carnicelli") and Development, on a derivative basis, in connection with an action captioned *James Carnicelli, Jr. v. John J. Fareri, Et Al* (FST-CV20-6048778-S) (the "Connecticut Action") pending on the Complex Litigation Docket of the Stamford Superior Court against Fareri, Julie Fareri and Christopher Sheskier.

4.     In the Connecticut Action, Mr. Carnicelli and Development seek damages associated with Fareri's fraud, breach of fiduciary duty and his wrongful actions that caused entities he controls not to pay Development its fair fees and rates in connection with multiple construction projects.[1]

---

[1] These projects include multiple projects *other than* the Gateway Kensington, LLC ("Kensington") project. Claims against Kensington were resolved in the AAA arbitration against Kensington ("Kensington Arbitration") where the three-member arbitration panel awarded Development $14,228,806. The Connecticut Action also seeks the lawful dissolution of Development, which is a Connecticut corporation. As a result, the Kensington Arbitration is relevant to the Connecticut Action to the extent that the Connecticut court is empowered to divide the assets of Development.

1

5.     In the Connecticut Action, Fareri has attempted to dismiss the case. That motion was denied by Judge Sheila A. Ozalis. Fareri also moved to compel arbitration. That motion was also denied by Judge Ozalis.

6.     Upon the granting of the arbitration award in the Kensington Arbitration, Mr. Carnicelli filed an Application for Temporary Injunction and Preliminary Injunction in the Connecticut Action, seeking to make sure that any payments by Kensington to Development were restrained at Development pending dissolution of the Connecticut corporation.

7.     A preliminary injunction hearing was set for May 26, 2021 in front of Judge Ozalis.

8.     On May 25, 2021, Development filed this Bankruptcy, in my view, in part, to avoid the preliminary injunction hearing set for May 26, 2021 and to prevent Development's collection of the arbitration award from Kensington.

9.     During the limited course of the Connecticut Action, Judge Ozalis ordered the production of documents, which Fareri refused to produce for over a year, despite Mr. Carnicelli's right to inspect such documents as a 49% shareholder of Development.

10.     Additional discovery in the Connecticut Action was due on June 4, 2021. Accordingly, it is my view that the Bankruptcy was filed in part to avoid discovery obligations in the Connecticut Action.

11.     While we do not have all the financial records of Development, we do have some financial records that were received only after Judge Ozalis ordered Fareri to produce such financial documents. One such document we were able to obtain was the QuickBooks of Development in native format.

12.     My firm has retained UHY Advisors, LLP ("UHY Advisors"), a national accounting firm, as a damages expert in the Connecticut Action.

13.     Attached hereto as Exhibit A is a balance sheet of Development prepared by UHY Advisors from the QuickBooks native format file produced by Fareri's personnel and Development (the "Balance Sheet").

14.     The Balance Sheet shows that as of December 31, 2020, Development has **$49,063.26** in total liabilities, hardly enough to justify this Bankruptcy.

15.     Development's total assets, however, stunningly and remarkably purportedly equal **$1,734,211.94**. Thus, according to the document produced in the Connecticut Action by Fareri and Development, six months ago total assets exceed total liabilities in excess of 35 to 1. While the Balance Sheet was prepared by UHY Advisors, the numbers are again derived directly from the QuickBooks native file prepared by Fareri and his personnel.

16.     Development has largely been dormant for two years. Indeed, Fareri provided an affidavit in the Connecticut Action dated May 25, 2021 (the date of the filing of this Bankruptcy), in which he stated that "[Development] has no currently ongoing operations and has not since 2019." (Affidavit of John J. Fareri in Opposition to Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction ¶ 34). Fareri also stated in his sworn affidavit that " [Development] has not engaged in any significant transactions or asset sales in the last year, and is not currently engaged in or contemplating any significant transactions or asset sales." (*Id.* ¶ 31).

17.     Thus, by Fareri's own admissions, Development's balance sheet at the time of the filing of this Bankruptcy should substantially be the same, absent manipulation, as Exhibit A.

18.     And while we are doubtful of the accuracy of the QuickBooks entries that were used to prepare the Balance Sheet, as they are dated as of approximately one year after Mr. Carnicelli was purportedly terminated from Development, the Balance Sheet reflects QuickBooks

entries prepared by Fareri and Development and produced in the Connecticut Action that completely contradict the filings in this Bankruptcy.

19.     Thus, it is my view that this Bankruptcy was filed in part to avoid obligations in the Connecticut Action, such as discovery and the preliminary injunction hearing, and is overall a bad faith filing with assets far exceeding stated liabilities, other than those liabilities to be adjudicated in the Connecticut Action.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 4, 2021

_____
Joseph M. Pastore III

# EXHIBIT A

# The Gateway Development Group, Inc
## Balance Sheet
### As of December 31, 2020

|  | Dec 31, 20 |
|---|---|
| **ASSETS** | |
|   **Current Assets** | |
|     **Checking/Savings** | |
|       1001 · Cash - Gateway #0750 | -2,139.04 |
|     **Total Checking/Savings** | -2,139.04 |
|     **Accounts Receivable** | |
|       1200 · Accounts Receivable | -270,624.67 |
|     **Total Accounts Receivable** | -270,624.67 |
|     **Other Current Assets** | |
|       1300 · Exch - JJF | 512,839.46 |
|       1310 · Exch - JEC | 1,494,136.19 |
|     **Total Other Current Assets** | 2,006,975.65 |
|   **Total Current Assets** | 1,734,211.94 |
|   **Fixed Assets** | |
|     1910 · Office Equipment | 54,605.11 |
|     1950 · Accumulated Depreciation | -54,605.11 |
|   **Total Fixed Assets** | 0.00 |
| **TOTAL ASSETS** | 1,734,211.94 |
| **LIABILITIES & EQUITY** | |
|   **Liabilities** | |
|     **Current Liabilities** | |
|       **Accounts Payable** | |
|         2000 · Accounts Payable | 49,063.26 |
|       **Total Accounts Payable** | 49,063.26 |
|     **Total Current Liabilities** | 49,063.26 |
|   **Total Liabilities** | 49,063.26 |
|   **Equity** | |
|     Equity - JEC Cash Basis | 4,175.72 |
|     Equity - JJF Cash Basis | 4,343.84 |
|     1110 · Retained Earnings | -168,998.69 |
|     1520 · Capital Stock | 1,000.00 |
|     Net Income | 1,844,639.99 |
|   **Total Equity** | 1,685,160.86 |
| **TOTAL LIABILITIES & EQUITY** | 1,734,224.12 |

EXHIBIT "4"

In the Matter of the Arbitration between:

James Carnicelli, Jr. derivitatively on behalf of

THE GATEWAY DEVELOPMENT GROUP, INC.

Claimant,

-and-

GATEWAY KENSINGTON, LLC. ,

Respondent.

Case No. 01-19-0004-4927

## AWARD OF ARBITRATORS

We, the undersigned arbitrators, having been designated in accordance with the arbitration agreement contained in the contract titled "Construction Management Agreement By and Between Gateway Kensington LLC and The Gateway Development Group, Inc." dated "as of May 5, 2014" ("Contract") and duly executed by Gateway Kensington LLC ("Kensington") and The Gateway Development Group, Inc. ("Development") ("Kensington" and "Development" collectively "Parties"), having been duly sworn, and having heard the proofs and allegations of the Parties issue this Final Award of Arbitrators ("Final Award"). This arbitration proceeding was conducted under the American Arbitration Association's Construction Industry Arbitration Rules. Eight evidentiary hearings were held from December 8, 2020 through December 18, 2020, during which both fact and expert witnesses were called to testify by the Parties. The Parties were represented by counsel, to wit, Claimant was represented by Steven L. Levitt and Trevor Gomberg of Levitt, LLP and Respondent was represented by Timothy T. Corey, Jared Cohane and Molly M. Quinn

1

of Hinckley Allen & Snyder, LLP. The Parties submitted post-hearing briefs and reply briefs which were received by the Panel. After receipt of the briefs, with leave of the Panel, the Parties submitted letters concerning certain matters raised in the briefs. The hearings were deemed closed on March 12, 2020, and by agreement of the parties the Award was due 45 days after closing.

## THE PARTIES

The claim is brought derivatively by James Carnicelli, Jr. ("Carnicelli") as minority shareholder of Development (49%) on behalf of Development to enforce its rights under the Contract. Carnicelli was the president of Development and ran its day-to-day operations. John Fareri ("Fareri") was the majority shareholder (51%) of Development. Development was a construction management firm whose work mainly consisted of construction projects performed for its majority owner Fareri.

Fareri is a real estate developer, and in addition to holding a majority interest in Development, held a majority interest in Kensington (99%) with the remaining interest (1%) held by his spouse. Kensington was formed to acquire, remediate, and develop a parcel of land in Bronxville, New York which is the subject of this dispute ("Project"), and Kensington retained Development as its construction manager for the Project. The Project had a Brownfield component to it whereby Fareri, personally, could obtain income tax credits for remediating and developing the site. The amount of the tax credit was primarily based on the cost of the cleanup and the cost of the construction of the buildings and appurtenant structures on the site. The tax credit was available for Site Preparation work (contamination remediation) and for Tangible Property work (above ground construction).

## THE PLEADINGS & PRIOR PROCEEDINGS

Demand for Arbitration

In its Demand for Arbitration, Development, through Carnicelli, alleged a breach of the Contract by Kensington for failing to pay the fees due to Development under the Contract. In an amplification of the claim submitted through a Detailed Statement of Claim which the Panel required of the Parties, Carnicelli also requested a dissolution of Development in addition to the breach of contract claim. Respondent moved to dismiss the dissolution claim on the grounds that the matter was not properly before the Panel, and that claim was dismissed by Order of the Panel dated June 24, 2020. The dismissal was solely based on jurisdictional grounds, and the Panel made no substantive ruling on the request for dissolution.

Answering Statement and Counterclaim

Aside from what amounts to a general denial of the breach of contract claim and the objection to the dissolution claim discussed above, Kensington asserted several counterclaims. The first alleged a breach of the Contract by Development for overbilling and improper charges against the Project by Development acting through Carnicelli. In total Kensington sought $2,982,919.43 in damages. Kensington also asserted a breach of fiduciary duties claim against Carnicelli arising out of the same alleged excessive and improper billing against the Project by Development which, it claimed, were inconsistent with the Contract. In response to Kensington's motion to dismiss the dissolution claim, Development cross-moved to dismiss the breach of fiduciary duty claim which the Panel denied by the Order dated June 24, 2020 with leave to renew at the end of the proofs. This renewal of the motion proved unnecessary as shortly before the hearings, Kensington withdrew its counterclaims.

3

**FACTUAL BACKGROUND**

The Project

It is undisputed that Fareri through his real estate development company Fareri Associates, bid on and was selected by the Town of Bronxville as the developer of the Project. The contract of sale was eventually assigned to Kensington, a sole purpose entity, formed to purchase and develop the Property. Kensington proposed to clean-up the site and build condominiums. Kensington submitted an application to the New York State Department of Environmental Conservation ("NYSDEC") for acceptance into the Brownfield Cleanup Program. Kensington was accepted into the program, and in June 2014, Kensington and NYSDEC entered into a Brownfield Cleanup Agreement ("BCA") (R[1]-87). As stated above, the BCA provided for tax credits for Fareri personally based upon the success and cost of the Site Preparation work and the Tangible Property work.

Agreements Between Kensington & Development for the Project

There were two agreements for the Project executed by the Parties. The first is dated December 7, 2015 for construction management services to be provided by Development. It is on standard AIA form A134-2009 titled "Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee without a Guaranteed Maximum Price." (R-148, hereinafter "A134 Agreement") This standard form of agreement calls for the construction manager (Development) to bill the owner

---

[1] References to "R- " and "C- " are to hearing exhibits submitted by Respondent ( R) and Claimant ( C)

(Kensington) for the "cost" of the work, a defined term, plus a Construction Management Fee. In the A134 Agreement, the Construction Manager's fee was set at $0.00.

Throughout the remediation portion of the work at the Project and through the construction of the condominium structure, Development invoiced Kensington for the work consistent with the December 7, 2015 agreement. That is, invoices were sent for the cost of the work as billed by trade contractors and for the labor and other services provided by Development itself to the Project without mark-up and without a construction manager fee added. These invoices were paid, except for a small balance, by Kensington. The Site Preparation remediation work was completed in late 2016 and a Certificate of Completion was issued by NYSDEC on December 28, 2016. (C-22)

The document which is the subject of this dispute, the Contract, was dated "as of May 5, 2014," the approximate date when the Project commenced, and was indisputably executed on or about March 9, 2018 by Fareri on behalf of Kensington and Carnicelli on behalf of Development. At the time it was signed, the remediation work had been certified as complete by NYSDEC, and 97% of the overall project was certified to have been completed (R-12) The Contract provides for higher amounts to be paid to Development for its personnel performing work on the Project based upon market rates as found in the RSMeans estimating guide ("RSMeans"). In addition, the Contract provides for a construction management fee of 10% on the "Cost" of the work as defined in the Contract, plus a $1,250,000.00 bonus conditioned upon early completion of Brownfield Cleanup work. As stated above, it is undisputed that the Contract was signed by Carnicelli on behalf of Development and Fareri on behalf of Kensington.

## The Brownfield Credit & Audit

In 2017, after receiving the Certificate of Completion for the Brownfield remediation work from NYSDEC, Kensington filed an IT-611.1 form with New York State requesting the tax credits (C-20). The IT-611.1 and accompanying schedules were prepared by in-house employees of Fareri and Kensington with the assistance and advice of outside consultants. Carnicelli was involved to the extent that he was asked by Kensington and did provide information to match Development personnel with the RSMeans categories. In arriving at the costs upon which the credit would be calculated, the IT-611.1 used the RSMeans rates for Development's employees, a completion bonus of $1,250,000.00, and a 10% construction manager's fee.

No back-up documents were required or submitted with the IT-611.1 but detailed schedules were attached showing the costs incurred for the remediation of the site from trade subcontractors and other entities providing work, labor, and services to the Project. The schedules also include the market RSMeans rates for Development personnel, a 10% construction manager's fee and a $1,250,000.00 early completion bonus for Development. By letter of December 30, 2017, the New York State Department of Finance commenced an audit of the tax credit application and requested back-up documents from Fareri and his wife Brenda Fareri to support the costs alleged to have been incurred by Kensington for the remediation. (C-33). Among the documents requested by NYS were specified invoices from certain vendors, among them, those supporting the claim for the work performed by Development, and the contract between Development and Kensington.

Admitted into evidence were a series of emails between Fareri's in-house employees including his chief financial officer Chris Sheskier, CPA and Joseph Moukattaf, some of which had Development's Carnicelli participating or copied, concerning the creation of a new

construction management agreement to submit to NYS in response to the audit request. This resulted in the creation of the Contract, the terms of which were dictated by Kensington. The allowable charges and fees to be paid to Development under the Contract were consistent with the charges claimed in the IT-611.1.

In addition to the Contract, after NYS's request for supporting back-up for the charges, Fareri's in-house representatives prepared new invoices from Development to Kensington consistent with the amounts claimed on the IT-611.1. The dates and invoice numbers of these new invoices were consistent with the actual invoices submitted contemporaneously by Development and paid by Kensington, but the amounts were based upon the RSMeans rates as provided in the Contract.

Among other things, the Contract and the new invoices were presented by Kensington to NYS in response to its audit. After some additional requests from NYS and submissions by Kensington, in July 2018 the Department of Finance finalized the audit, and with some adjustment downward, certified a $6,284,540.00 tax credit for the Site Preparation work that could be claimed by Fareri.

Thereafter, Kensington submitted its IT-611.1 for the Tangible Property portion of the Project using the Contract and the RSMeans rates and a 10% construction manager fee.

In the summer and fall of 2019 a dispute arose between Carnicelli and Fareri concerning the compensation to be paid to Development by Kensington on the Project. When Carnicelli rejected an offer from Fareri to settle claims on the Project and others performed by Development for Fareri entities, Carnicelli was summarily discharged from Development by Fareri, was locked out of the office by Fareri, and Development ceased to operate. Carnicelli was discharged on October 18, 2019. (C-85)

On December 30, 2019 Mr. Sheskier sent a letter on "John Fareri" personal letterhead to the NYS Audit Bureau confirming a conversation of November 8th in which Sheskier stated that certain cost "discrepancies" related to the Tangible Property Credit shown on the IT-611.1 for the tax year 2017 had been found and the costs were overstated (R-108). In the letter, Mr. Sheskier noted that Kensington was in the process of an "internal audit" which would result in the removal of certain costs from the submission. With the letter, Kensington submitted an amended IT-611.1 for the Tangible Tax Credit which eliminated all Development labor charges. The amended IT 611.1 for the Tangible Site Credit was ultimately approved by New York State.

As to the already approved Site Preparation Credit, on November 25, 2020, Kensington submitted a Voluntary Disclosure Application with NYS stating that the 2016 Site Preparation Credit for 2016 had been overstated and requesting permission to amend its IT-611.1 which had been approved by NYS in July 2018. As of the conclusion of the hearings, NYS had not acted on the request to amend the IT-611.1 for the Site Preparation work.

## CLAIMS OF THE PARTIES

### Claims of Carnicelli on behalf of Development

Carnicelli's claim on behalf of Development is quite straightforward. He seeks to enforce the terms of the Contract and be paid as shown on the new invoices. He alleges that the Contract was not conditioned upon receipt of the tax credits by Fareri, and that Development is entitled to the benefits of the Contract including the completion bonus, the construction management fee and the costs based upon the RSMeans rates. Carnicelli further argues that although he was involved with and did prepare the drafts and final version of the Contract, the terms of the Contract were dictated by Fareri's representatives to increase the tax credit and to fulfill Fareri's agreement to

8

fairly compensate Development for its work on the Project.  Carnicelli also argues that he was not
involved with the tax credit applications which benefited Fareri only.

Claims and Defenses of Kensington

Kensington did not initially plead nor argue in its pre-hearing submissions
and motion papers that the Contract was unenforceable, and in fact, Kensington asserted
counterclaims based upon the Contract.  Shortly before the hearings began, Kensington's position
changed, and the central point of Kensington's defense at the hearings was that Fareri was unaware
that (1) the Contract, which he admittedly signed on behalf of Kensington, was inconsistent with
the actual billings of Development; (2)  that the tax credit submissions  and his personal tax returns
included costs based upon the Contract, or (3) that new invoices were created and submitted to
support the costs.

Aside from this professed ignorance of the tax credit application filings, Fareri
asserted that the filings were fraudulent and improper, and Development's claim could not be
rightly sustained based upon these fraudulent documents and filings.  He alleges that the Contract
and the new invoices were created solely to improperly support an increased tax credit for himself.
He further alleges that he is attempting to correct the tax credit filings for the Site Preparation
Credit and has amended the Tangible Property Credit application to delete all Development
billings for its own personnel.  Fareri concedes additional compensation is due to Development
but less than what is provided for in the Contract.

In response to Kensington's defense, Carnicelli argues that the Contract was signed
by Kensington and Development and is a binding obligation and should be enforced.  Carnicelli
further argues that the increase in fees and reimbursements to Development were a way for Fareri

and Carnicelli to "true up" the actual fees to be paid to Development which he alleges Fareri and he had orally agreed to do after completion of the Project.

## DISCUSSION & FINDINGS

Summary of Findings

For the reasons set forth below, we find the Contract to be a valid and binding obligation of Kensington and should be enforced in accordance with its terms. Summarily, the Contract was admittedly executed by Carnicelli on behalf of Development and Fareri on behalf of Kensington, and until the eve of the hearings, Kensington affirmatively argued that the Contract was valid. It sought damages of approximately $3,000,000.00 for breach of the Contract and breach of fiduciary duty owed under the Contract by Development (see, Answering Statement; see Fareri Declaration Affidavit (C-93).

As stated above, shortly before the first evidentiary hearing, after discovery was virtually complete, Development disavowed the validity of the Contract, withdrew its counterclaim and argued that the Contract was created by Carnicelli and employees of Fareri without his knowledge for fraudulent purposes (which notably benefitted Fareri personally), and so, the Contract was not enforceable at all. During the hearings, Kensington admitted a contractual relationship existed between it and Development, and that Development was owed more than what it had been paid. However, Kensington vacillated as to the terms of the agreement and what precisely was owed to Development. Under these circumstances we find the Contract, admittedly executed freely by Carnicelli and Fareri, to be the accurate representation of the agreement of the parties and should be enforced.

Moreover, Kensington, relying on the advice of an expert it had retained, recorded liabilities to Development for project costs it incurred in calendar years 2016 and 2017 upon which it relied when reporting the project costs on both its Federal and New York State Partnership Returns, all executed under penalties of perjury affirming these legal obligations. The liabilities included in the Contract are the liabilities Kensington previously recorded and on which it relied to claim millions of dollars of Brownfield Tax Credits ("BTC") from New York State which were allocated to its members. We were not persuaded by Kensington's and Fareri's attempts to amend the returns and filings after the dispute with Development arose and Development sought the benefits of the Contract.

Respondent's Answering Statement and Detailed Statement of Setoff and Counterclaim

In Respondent's Answering Statement and Detailed Statement of Setoff and Counterclaim dated May 22, 2020 ("Answering Statement"), Kensington did not claim the Contract was invalid, but conceded that the Contract was a valid agreement entered into by Development and Kensington (Answering Statement, par. 5) and that it was breached by Development. Kensington referenced each of the terms of the Contract that it now seeks to avoid; the "reimbursable rates for project staff for the cost of the Project.....;" (the rates referenced are the RSMeans rates found in the Contract); "under Article VII of the (Contract) the Construction Manager was only entitled to a 10% fee for 'Site Prep' costs associated with the Brownfield remediation phase[2], plus a one-time bonus of $1,250,000.00....." (Answering Statement, Par. 6).

Thus, Kensington did not contest the RSMeans rates, the "one-time bonus" or the construction management ("CM") fee on the site preparation work. It did not allege that

---

[2] Development seeks 10% construction management fee on the Tangible portion of the Project as well.

Kensington's internal audit revealed that RS Means rates, the CM fee and the bonus were improper charges as it now does. Rather, Kensington alleged that the internal audit in November 2019 instead found overbillings by Development having nothing to do with the RSMeans rates, the CM fee or the bonus. Kensington alleged that Carnicelli, acting through Development, breached the Contract by overbilling the Project through overstaffing and billing for work performed at other Projects. (Answering Statement, par. 6)

Specifically, Kensington alleged that Development "billed for project managers and staff at 4.33 weeks per month, regardless of whether staff was on vacation, sick or working on other projects......" thereby overbilling the Project by $291,930.00. (Answering Statement, par.13) It further alleged that Development "overstaffed the Project…….., including between five and six full-time managers, when the needs of the Project should have required no more than three full-time management personnel" for an overcharge of $259,800.00. (Answering Statement, par.14) Also, among other things, Kensington argued that Development billed $1,458,282.72 for vendors supplying work to other projects including Carnicelli's private residence (Answering Statement, par. 9). In all Kensington claimed that Development owed Kensington nearly $3,000,000.00 for charges that were not in accordance with the Contract.

The Answering Statement also confirmed that "Kensington submitted the (Contract) and labor invoices for audit by NYSDEP in conjunction with obtaining the (Brownfield) credit." (Answering Statement, par. 7)

Although the affirmative counterclaim was ultimately withdrawn by Kensington through its Amended Answering Statement dated September 23, 2020, the withdrawal did not come with a clear repudiation of the Contract, but rather, with an acknowledgment of the existence

of the Contract but "leav(ing) the Claimant to its proof as to its operative effect." (see, Amended Answering Statement) There was no mention of illegality or fraud in this amended pleading.

## Fareri Declaration

Kensington also submitted a sworn Declaration from Fareri dated January 31, 2020 in conjunction with Kensington's motion to dismiss. In that sworn statement, which he stated was "based upon personal knowledge," Fareri again did not deny the Contract's validity but made the same claims concerning overbilling, overmanning of the Project, and submission of vendor invoices by Development for work on other projects in breach of Development's obligations under the Contract. (C-93)

## Fareri Hearing Testimony

In his hearing testimony, Mr. Fareri, in effect, repudiated the A134 Agreement and the Contract, but stated that Development was due more than just the pass-through sums described in the A134 Agreement, but not as much as required by the Contract. He further testified that he was unsure of the amount actually due to Development in addition to what had been paid, at times claiming that approximately $810,000.00 was due (see Hearing testimony, Day 7, pages 1564-1568), and later $510,795.00 (Id, page 1575). There was also some vague testimony that the 1% shown on the pro formas submitted to Kensington's lender was the proper CM fee due to Development, which, it was claimed, would have been paid had Development simply billed it.

We find Fareri's testimony that he was unaware of the existence of the Contract or its terms, and that it was prepared solely for nefarious purposes (for the benefit of Fareri personally) by Mr. Sheskier, Joseph Moukattaf and Fareri consultants to be inaccurate at best, at

the very least unpersuasive, and inconsistent with his Declaration. This testimony is belied by, among other things, the fact that although Fareri contends that Mr. Sheskier created and submitted fabricated documents and invoices to governmental authorities placing Fareri in serious criminal jeopardy, Mr. Sheskier is still employed by Fareri and is apparently managing his attempts to withdraw these purportedly fraudulent documents. Additionally, Mr. Sheskier continues to be Fareri's attorney-in-fact. In any event, Fareri is a sophisticated businessman who is bound by documents he willingly executed including the Contract.

We also find that filings and payment applications submitted to Kensington's lender do not control the contractual relationship between Development and Kensington, and so, they do not impact our view that the Contract should be enforced in accordance with its terms.

We further find Kensington's contention that the Contract applied only to the Site Preparation work and not the Tangible Property work to be unsupported by the language of the Contract itself and inconsistent with Kensington's own records.

The Brownfield Tax Credit Issue ("BTC")

As stated above, Kensington ultimately argued that the Contract created to support the BTC it claimed for 2016 and 2017 was prepared without Fareri's knowledge for the illegitimate purpose of increasing Mr. and Mrs. Fareri's BTC, and so, unenforceable. We reject this contention for several reasons.

First, Kensington retained the services of an expert to advise it on how to maximize the tax credit and accepted the advice of that expert in establishing rates and costs to be paid to Development consisting of the RSMeans labor rates, a bonus, and a CM fee. Second, Kensington recorded these costs as amounts payable to Development for 2016 and 2017 prior to executing the

Contract which, by its execution, ratified its prior actions recording the amounts payable to Development. Finally, as stated above, we find not credible Fareri's testimony that he was unaware of these activities and the filing of the IT-611.1 forms and tax returns, submitted under oath, which inured only to his personal benefit.

We note that Fareri took full advantage of the actions of Mr. Sheskier, Mr. Moukattaf and his consultants until October 2019 when Mr. Carnicelli sought the benefits of the Contract, after which he was summarily discharged, and Kensington sought to disavow the documents and filings. We also find that in creating the Contract, Kensington dictated the terms and did so for dual purposes, first to increase the Brownfield tax credit, but also to fairly compensate Development for its services. This is supported by Fareri's testimony that the A134 Agreement did not accurately reflect what Development was to be paid for its services. Concerning the tax credit filings, the evidence established that the filings, with their detailed schedules, were prepared by and filed by Mr. Scheskier and Mr. Moukattaf. Carnicelli's involvement consisted of the preparation of the Contract whose terms were dictated by Mr. Sheskier and Mr. Moukattaf and matching Development workers to the categories found in RSMeans. We found no credible evidence to support a finding of fraud by Carnicelli or Development.

Regardless, we heard no testimony to support the contention that matching the remediation and construction costs to market rates and submitting them to support a tax credit would be improper, provided that the costs are actually paid. It is obvious that filing documents showing higher costs than actually incurred would be improper, but here Kensington, by the written Contact, bound itself to pay the additional costs. In fact, as noted above, Fareri conceded that Development was due more than the pass-through amounts it was paid although he was unable

to precisely arrive at the amount actually due, in effect saying that it was more than the A134 Agreement but less than provided for in the Contract.

## Monetary Award

Claimant submitted an expert report from Scott Rutter, CPA of CitrinCooperman, and Mr. Rutter testified at the hearings. The report and testimony followed the terms of the Contract. In arriving at each component of damages, Mr. Rutter calculated the amount due under the Contract and subtracted the amount previously paid to Development to arrive at the amount he claimed was due to Development. In the instances where actual invoices to calculate costs were not available to him, he credibly extrapolated the amount due from ancillary documents that we found to be sufficient.

Respondent submitted a report from Patrick A. McGeehin of FTI Consulting, and Mr. McGeehin testified at the hearings. Although a credible witness, Mr. McGeehin did not contest the amount of the damages found in the Rutter report, but rather relied almost exclusively on the position that the Contract was unenforceable. As stated above, we have found the Contract to be enforceable, and so we have not incorporated Mr. McGeehin's calculation of damages in this Award although his opinion was considered.

In accordance with the findings above, we Award Claimant, The Gateway Development Group, Inc., the following:

| | | |
|---|---|---|
| 1. | Site Prep Labor Balance Due– 2016 | $1,571,329.00 |
| 3. | Site Prep Work Bonus – 2016 | $1,250,000.00 |
| 4. | Site Prep Construction Manager's Fee – 2016 | $1,151,031.00 |

| 5.  | Tangible Labor Balance Due– 2017 | $2,475,812.00 |
| 6.  | Tangible Portion Bonus - 2017 | $0.00 |
| 7.  | Tangible Construction Manager's Fee – 2017 | $4,486,983.00 |
| 8.  | Tangible Labor Balance Due - 2018 | $1,023,247.00 |
| 9.  | Tangible Portion Bonus - 2018 | $0.00 |
| 10. | Tangible Construction Manager's Fee – 2018 | $534,394.00 |
| 11. | Tangible Labor Balance Due - 2019 | $181,388.00 |
| 12. | Tangible Portion Bonus - 2019 | $0.00 |
| 20. | Tangible Construction Manager's Fee – 2019 | $43,173.00 |
|     | TOTAL | $ 12,717,357.00 |

Interest, Costs and Counsel Fees

We have determined that the appropriate starting point for interest is December 31, 2019, and the appropriate interest rate to be New York's statutory rate of 9% per annum.

As to Development's claim for costs and counsel fees, the Contract does not provide for a prevailing party award of counsel fees. Rule 48 (d)(ii) permits the panel to award counsel fees if all parties request them. Here, Claimant and Respondent initially requested an award of costs and counsel fees but, with the permission of the Panel, Respondent withdrew its counterclaim which included the request for the award of costs and counsel fees, and so, we are without authority to make such an award under Rule 48 (d)(ii).

Claimant has argued that under New York Business Corporation Law 626(e), Mr. Carnicelli is entitled to an award of cost and fees to himself, individually, from Respondent. That statute, however, concerns the award of counsel fees to a shareholder from the corporation on

whose behalf she or he successfully prosecuted a claim, in this case from Development. The statute does not increase the liability of a defendant (Kensington) for attorneys' fees and costs from what would be available in a non-derivative action.

In denying the claim for counsel fees, we make no determination concerning Mr. Carnicelli's entitlement through New York Business Corporation Law 626(e), shareholders' agreement or otherwise to reimbursement of fees and costs from Development that he may have advanced to prosecute the claim. However, that is not a matter properly before the Panel, and we must leave it to be decided in another forum.

. The administrative fees of the American Arbitration Association totaling $30,110.38 and the compensation of the arbitrators totaling $163,059.00 shall be borne by Kensington. Therefore, Kensington shall reimburse Carnicelli the sum of $104,640.38, representing that portion of said fees in excess of the apportioned costs previously incurred by Carnicelli.

Accordingly, within 30 days of the date of this Award, Respondent Gateway Kensington, shall pay to Claimant The Gateway Development Group, Inc. the sum of $12,717,357.00, plus interest from December 31, 2019 to April 26, 2021 totaling $1,511,449.00, plus arbitration compensation and AAA fees in the amount of $104,640.38 for a total Award of $14,333,446.38. If payment is not made within the 30 days allotted above, interest will accrue thereafter on any unpaid amount at the statutory judgment rate of 9% per annum.

To the extent that claims or defenses are not specifically mentioned above, they were considered and rejected. This Award is in full settlement of all claims and counterclaims submitted in this Arbitration. All claims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

4/25/2021
Date

_____
Thomas J. Rossi

_____
Date

_____
Peter Liloia III

_____
Date

_____
William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

4/25/21
_____
Date

_____
Thomas J. Rossi


I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.


_____
Date

_____
Peter Liloia III


I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.


_____
Date

_____
William Chandler

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____
Date

_____
Thomas J. Rossi

_____
Date

_____
Peter Liloia III

_____4/23/2021_____
Date

_____
William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                 Thomas J. Rossi


I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                 Peter Liloia III


I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

___4/23/2021_____          _____
Date                                                 William Chandler

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____
Date

_____
Thomas J. Rossi

*APRIL 23, 2021*
_____
Date

_____
Peter Liloia III

_____
Date

_____
William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____            _____
Date                               Thomas J. Rossi


I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_APRIL 23, 2021_                   _Peter Liloia III_
Date                               Peter Liloia III


I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____            _____
Date                               William Chandler

EXHIBIT "5"

# Spano Abstract Service Corp.

350 Old Country Road, Suite 205, Garden City, NY 11530
(516) 294-7037 * Fax # (516) 742-9375 info@spanoabstract.com

May 12, 2021
By email only:
ddepietro@levittlawllp.com

**RE:  Title No: SS13119**
Premises: 15 Kensington Avenue (fka 5-27), BRONXVILLE, NY 10708
Your Ref: GATEWAY KENSINGTON LLC

Dear Debbie:

With reference to your request for a last deed search on the above captioned property, below please find the **eight units owned by Gateway Kensington LLC**:

| Unit | Section-Block-Lot and Unit |
|---|---|
| 15 Kensington Rd **#104**, Bronxville, NY 10708 | 11-5-1 Unit 104 |
| 15 Kensington Rd **#110**, Bronxville, NY 10708 | 11-5-1 Unit 110 |
| 15 Kensington Rd **#208**, Bronxville, NY 10708 | 11-5-1 Unit 208 |
| 15 Kensington Rd **#211**, Bronxville, NY 10708 | 11-5-1 Unit 211 |
| 15 Kensington Rd **#311**, Bronxville, NY 10708 | 11-5-1 Unit 311 |
| 15 Kensington Rd **#312**, Bronxville, NY 10708 | 11-5-1 Unit 312 |
| 15 Kensington Rd **#408**, Bronxville, NY 10708 | 11-5-1 Unit 408 |
| 15 Kensington Rd **#410**, Bronxville, NY 10708 | 11-5-1 Unit 410 |

The information supplied was obtained from sources believed to be reliable, however, the same is not guaranteed or insured. Liability is limited to the cost of the search.

If we may be of any further assistance to you in this or any other matter, please do not hesitate to contact this office.

Very truly yours,

*Jeanine Greco*
Spano Abstract Service Corp.